UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THERESA M.,[1]

         Plaintiff,

   v.

MARTIN O'MALLEY,

         Defendant.

Case No.  23-cv-01264-TSH

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 15, 18

## I.    INTRODUCTION

Plaintiff Theresa M. moves for summary judgment to reverse the decision of Defendant Martin O'Malley, Commissioner of Social Security, denying Plaintiff's claim for disability benefits under the Social Security Act, 42 U.S.C. § 401 et seq.  ECF No. 15.  Defendant cross-moves to affirm.  ECF No. 18.  Pursuant to Civil Local Rule 16-5, the matter is submitted without oral argument.  Having reviewed the parties' positions, the Administrative Record ("AR"), and relevant legal authority, the Court hereby **GRANTS** Plaintiff's motion and **DENIES** Defendant's cross-motion for the following reasons.[2]

## II.    BACKGROUND

### A.    Procedural History

Plaintiff initially filed an application for Social Security disability benefits on January 11, 2010, alleging a disability onset date of November 13, 2007.  No. 4:13-cv-03052-DMR, ECF No. 10-6 at 2–8.  She later amended her disability onset date to August 5, 2009.  No. 4:13-cv-03052-

---

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

[2] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF Nos. 7, 8.

DMR, ECF No. 10-3 at 39. Her application was initially denied on May 27, 2010. No. 4:13-cv-03052-DMR, ECF No. 10-5 at 2–5, and again on reconsideration on August 6, 2010. *Id.* at 8–12. On September 21, 2010, Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). *Id.* at 22–23. On November 30, 2011, Plaintiff had a hearing before an ALJ. No. 4:13-cv-03052-DMR, ECF No. 10-3 at 33–69. The ALJ issued an unfavorable decision on December 22, 2011. AR 107–120.

On February 9, 2012, Plaintiff filed a request for review with the Appeals Council. No. 4:13-cv-03052-DMR, ECF No. 10-3 at 14. The Appeals Council denied review on February 20, 2013. *Id.* at 7–10. Plaintiff sought review in federal court *pro se*. AR 139. On September 17, 2014, Magistrate Judge Donna M. Ryu granted summary judgment in favor of the Commissioner. AR 139–173. Plaintiff had argued she was disabled in part because of her Ehlers-Danlos Syndrome, but Judge Ryu declined to consider those arguments because the record did not contain evidence of this diagnosis. AR 169.

Plaintiff filed a second application for benefits under Title II and Part A of Title XVIII on September 23, 2014, alleging a disability onset date of November 1, 2007. AR 291–92. The Social Security Administration ("SSA") issued a Title II decision denial notice and a Title XVI decision denial notice on February 4, 2015. AR 236–40, 241–45. Plaintiff requested reconsideration of the initial notice of denial on February 23, 2015. AR 231–32. The SSA issued a Title II reconsideration decision denial notice on August 7, 2015. AR 246–50[3]. Plaintiff requested review of the reconsideration denial by an ALJ on August 26, 2015. AR 234–35.

ALJ Robert Milton Erickson held a hearing on March 9, 2017. AR 51–106. At the hearing, Plaintiff agreed to amend the disability onset date to December 23, 2011, after the ALJ determined she would not be able to obtain benefits prior to the unfavorable decision issued December 22, 2011. AR 58–59. A Notice of Decision-Unfavorable was issued on May 4, 2017. AR 30–32. The Appeals Council denied Plaintiff's request for review on November 14, 2017, AR 663–668, and, on May 23, 2018, extended the time Plaintiff would have to file a civil action for

---

[3] The date is contained in the table of contents to the AR, which calls this document the "T2 Disability Reconsideration Notice, dated 08/07/2015."

court review.  AR 752.  On May 31, 2018, Plaintiff sought review pursuant to 42 U.S.C. § 405(g).

Case No. 3:18-cv-03235-TSH, ECF No. 1.  Upon reviewing ALJ Erickson's decision, the

Commissioner offered to stipulate to remand the case pursuant to 42 U.S.C. § 405(g).  AR 675.

Plaintiff rejected Defendant's proposal and filed a motion for summary judgment, while

Defendant filed a motion to remand.  AR 675.  On April 22, 2019, this Court granted Defendant's

motion to remand for further proceedings.  AR 690.

ALJ Charles Davis held a hearing on February 18, 2020, and issued an unfavorable

decision on April 7, 2020.  AR 632–44, 560–72.  Plaintiff challenged that decision in Case No.

3:20-cv-5360 TSH.  The Commission stipulated to remand to the ALJ and instructed the ALJ "to

reevaluate the medical evidence and Plaintiff's subjective symptom testimony, offer Plaintiff the

opportunity to submit additional evidence, and take any further action to complete the

administrative record and issue a new decision."  AR 1047–48.  The Appeals Council directed the

ALJ to:

> Give consideration to the treating source opinion pursuant to the
> provisions of 20 CFR 404.1527, and explain the weight given to such
> opinion evidence.  As appropriate, the Administrative Law Judge may
> request the treating source provide additional evidence and/or further
> clarification of the opinion and medical source statements about what
> the claimant could still do despite the impairment through December
> 31, 2012 (20 CFR 404.1520b).  The Administrative Law Judge may
> enlist the aid and cooperation of the claimant's representative in
> developing evidence from the claimant's treating source.
>
> Further evaluate the claimant's alleged symptoms and provide
> rationale in accordance with the disability regulations pertaining to
> evaluation of symptoms (20 CFR 404.1529).

AR 982.

On remand, ALJ Charles Davis held an administrative hearing on July 12, 2022, and issued

an unfavorable decision on November 22, 2022.  AR 1000–23, 979–93.  The ALJ's decision

became a final agency decision 60 days later, after no action was taken by the Appeals Council.

*See* 20 C.F.R. § 404.984(a), (c), (d).  Plaintiff now seeks review pursuant to 42 U.S.C. § 405(g).

*See* ECF Nos. 1, 15 (Pl.'s Mot.).

United States District Court
Northern District of California

3

**B.      Age and Work Experience**

Plaintiff is 64 years old.  AR 507.  She graduated from high school but had no further education.  AR 80.  Plaintiff last worked in November 2007 as a sales associate.  AR 64–66.

**C.      Medical Evidence**

**1.      Consultative Examination by Dr. Seung Ha Lim**

On July 19, 2013, Seung Ha Lim, M.D., wrote his summary report of an internal medicine consultative examination he conducted of Plaintiff.  AR 382–85.  Dr. Lim described himself as "[b]oard [e]ligible" in internal medicine.  AR 385.  Dr. Lim provided the following functional assessment: Plaintiff is restricted to standing and/or walking about six hours in an eight-hour workday with appropriate breaks; she can sit for six hours in an eight-hour workday with appropriate breaks; she can lift or carry 20 pounds occasionally and 10 pounds frequently; she does not have limitations on pushing, pulling and overhead reaching other than these weight limitations; and she can occasionally climb and stoop.  *Id.*

Dr. Lim observed, among other things, Plaintiff's "slow gait [and] complaining of back pain," AR 383, and "pain on motion, paravertebral tenderness, and decreased range of motion of the back with 60/90 degrees of flexion, 20/25 degrees of extension, and 15/25 degrees of lateral bending to the right and left."  AR 384.  He observed "[p]eripheral pulses 2/4 and symmetrical throughout," "long arms and legs," "joints in the upper and lower extremities are flexible," "bunions on the feet," and "range of motion of the joints of the upper extremities and lower extremities is within normal limits, bilaterally."  *Id*.

**2.      Consultative Examination by Dr. Ognjev Petras**

On December 3, 2014, Ognjev Petras, M.D., saw Plaintiff for a consultative internal medical examination.  AR 388–96.  Dr. Petras is certified by the California State Medical Board as an internist.  AR 396.

Dr. Petras confirmed Plaintiff's diagnosis of Ehlers-Danlos Syndrome ("EDS").  AR 395.  He noted that she has "some joint hypermobility and elbow/forearm pain related to Ehler-Danlos (sic) syndrome," "[l]ow back pain due to degenerative disease in the lumbar spine," "intermittent radiculopathy symptoms and some left sided sensation loss in the L5 and S1 dermatomes related

4

to neural foraminal stenosis in her lumbar spine," and "[l]eft foot pain." *Id*. Dr. Petras also observed she "is missing more than 50% of her teeth, including most of her molars." AR 391. In examining Plaintiff, Dr. Petras observed "tenderness to palpation over the right-sided lumbar paraspinal muscles," AR 392. He also noted "tenderness to palpation over the medial/lateral epicondyles of both elbows, and over the flexor tendons of both forearms." AR 393. Further, Dr. Petras observed "surgical scars over both great toes, and bilateral hallux valgus." *Id*. "Palpation over the plantar aspect of the left foot elicited neuropathic pain th[at] radiated from the foot to the left great toe." *Id*. Additionally, Dr. Petras wrote that Plaintiff's "[g]ait [] does not appear to be painful, but is somewhat wide-based. Claimant walked with a cane she held to her right, or in front of her while walking. Her posture was mildly stooped forward while walking. There was no obvious ataxia while she was walking. However, claimant walked at a slow pace only (while in the clinic, and while observed walking to the clinic from the clinic windows)." AR 394. In documenting Plaintiff's medical history, Dr. Petras wrote that Plaintiff "frequently feels 'dizzy' while walking, and has had (sic) dizzy for several years. She denied that her dizzy sensation was akin to vertigo (room spinning)." AR 390.

By Dr. Petras's assessment, Plaintiff "can stand and walk 2 hours out of an 8 hour work day"; she will "have to alternate sitting with standing/walking every 15-30 minutes"; "[s]he can reach and grasp in all directions and has normal fine fingering capabilities in both hands"; her "[l]ifting and carrying is limited to 10 pounds frequently and up to 20 pounds occasionally"; "[s]he can bend over occasionally, kneel and crawl occasionally, and squat occasionally"; and "[s]he has no communicative limitations. She has no sensory limitations. Environmental limitations: she requires level terrain to ambulate safely and efficiently. She will benefit from a cane when walking more than 100 feet, but can walk short distances without a cane." AR 395–96.

### 3.    Consultative Examination by Dr. Randy Kolin

On December 4, 2014, Randy Kolin, Psy.D., conducted a "comprehensive mental status evaluation" of Plaintiff. AR 399–404. Dr. Kolin was provided a copy of Plaintiff's Adult Disability Report (SSA Form 3368, AR 316–22) for review in connection with his consultative examination of Plaintiff. AR 399.

5

United States District Court
Northern District of California

1  Dr. Kolin assessed Plaintiff's ability for abstraction as "adequate" but assessed her mental

2  functions as impaired in the areas of attention and concentration, fund of knowledge, and memory

3  for recently received information.  AR 401–02.  Dr. Kolin administered the WAIS-IV test to

4  assess Plaintiff's cognitive abilities.  *Id.*  Plaintiff's verbal comprehension was "average."  Her

5  perceptual reasoning and working memory index were "low average."  AR 402.  Her processing

6  speed was "borderline" (the classification between "low average" and "extremely low.")  *Id.*  Her

7  full-scale IQ of 86 was "low average."  *Id.*  Dr. Kolin administered the WMS-IV test to assess

8  Plaintiff's memory functions.  AR 402–03.  In all four areas of memory function tested

9  (immediate memory, delayed memory, auditory memory and visual memory) Plaintiff's results

10  were "low average."  AR 403.

11  Dr. Kolin administered the Trail Making Test to assess the possibility of organic brain

12  damage.  *Id.*  Plaintiff's scores did not indicate likely brain damage, but Plaintiff's Trail A time of

13  completion of 39 seconds was close to the "greater than 40 seconds" that indicates a likelihood of

14  brain damage.  *Id.*

15  Dr. Kolin opined that from a psychological standpoint, Plaintiff had the following

16  functional impairments: she is mildly limited in the ability to adequately perform complex tasks,

17  mildly limited in her ability to perform basic work activities and be safety conscious without

18  special or additional instructions, mildly limited in the ability to maintain regular attendance in the

19  workplace, mildly limited in the ability to complete a normal workday without interruptions from

20  psychiatric conditions, mildly limited in the ability to handle workplace stress, and moderately

21  limited in the ability to accept instructions from supervisors and interact appropriately with fellow

22  employees and the public.  AR 404.  Dr. Kolin stated that Plaintiff's "mental health symptoms

23  may be chronic in nature" and "will not abate on [their] own within a one year period."  *Id.*

24  ### 4.  Reports by Non-Treating, Non-Examining State Agency Physicians

25  #### a.  Medical Assessments

26  Drs. Bradus and Clift[4] provided medical assessments at the initial and reconsideration

27

28  _____
[4] The Social Security Administration did not identify the first names of its in-house medical personnel.

6

stages, respectively.  AR 208–09, 226–27.  Both opined that Plaintiff had exertional, postural, and

environmental limitations.  AR 208–09, 226–27.  They both concluded Plaintiff could lift and

carry 20 pounds occasionally and 10 pounds frequently; that she could sit, stand or walk six hours

in an eight-hour workday; she had no limits on balance and climbing and could occasionally

stoop, kneel, crouch or crawl; that she had no manipulative, communicative or visual limitations;

and that her only environmental limitation was to avoid concentrated exposure to fumes, odors,

dusts and gases.  AR 208–09, 226–27.

### b.      Mental Health Assessments

Drs. Ferrell and Morando provided mental health assessments at the initial and

reconsideration stages, respectively.  AR 206, 221–24.  Dr. Ferrell identified anxiety as a mental

health issue for Plaintiff.  He stated that she had not undergone any psychiatric hospitalizations

and was not on any psychiatric medications.  He noted Plaintiff lived independently and takes care

of household chores.  He also noted her limited fund of knowledge, impaired recent memory and

IQ of 85.  AR 206.  Dr. Morando determined that no mental medically determinable impairments

had been established for Plaintiff.  AR 221–24.

### 5.      Report by Treating Physician Dr. Rachel Stern

Rachel Stern, M.D., of San Francisco General Hospital, was Plaintiff's treating physician

beginning at least in July 2014.  AR 435.  On June 9, 2015, Dr. Stern provided a treating medical

source statement concerning Plaintiff's health.  AR 514.

Dr. Stern identified the following objective clinical findings as support for the indicated

diagnoses: "EDS exam – joint hypermobility, periodontitis, connective tissue disorder;

Echocardiogram397-0, tricuspid valve; 780-2 syncope/collapse; 785.2 undiagnosed cardiac

murmur; MRI 2002 – L4-5 bulge, tear, neural foraminal narrowing; L5-S1 central protrusion/tear,

nerve root displaced."  AR 513.  Dr. Stern found that these objectively established medical

conditions "support[ed] a complaint of pain, fatigue."  *Id.*  Dr. Stern stated that Plaintiff's

complaints are supported by the underlying conditions because "chronic joint pain is 2/2 joint

hypermobility, herniated lumbar disc, foot injury; dizziness, fatigue is 2/2, mitral valve disorder."

*Id.*  Dr. Stern further noted that Plaintiff's impairments would last longer than 12 months because

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1    Plaintiff "shows debilitating musculoskeletal manifestations, stiffness w/ progressive limitations

2    of joint motion.  EDS is a permanent, inherited, degenerative connective tissue disorder." *Id.*  Dr.

3    Stern identified the following as recommended treatment modalities: "PT – low resistance

4    exercise, diagnostic w/u, elbow, back braces, pain meds 600 [mg] ibu[profen] [some]what

5    effective[e], ref to MH, completed pain management counseling." *Id.*  Dr. Stern opined that

6    possible side effects of the proposed treatment program were: "physically challenging, muscle

7    soreness, bruising, [and] nausea." *Id.*

8        With regard to the limitations of physical functionality, Dr. Stern opined Plaintiff could lift

9    or carry 10 pounds frequently; walk or stand one hour and sit two to four hours in an eight-hour

10   day and would require a change of position after standing for 5 to 10 minutes, walking for 15

11   minutes or sitting for 15 to 20 minutes; and should not bend, stoop, or climb because of Plaintiff's

12   "ligament laxity [and] nerve root compression."  AR 514.  Dr. Stern opined that bending

13   "exacerbates joint instability and pain" and noted Plaintiff's "balance is dangerously unstable – no

14   [climbing]." *Id.*

15       Dr. Stern opined that Plaintiff's exertional limitations were attributable to "joint

16   pain/hypermobility, L-spine nerve compression, cardiac fatigue," the fact that Plaintiff's "body

17   mass does not support lifting – at risk for dislocations;" and the presence of "vascular fragility –

18   rupture could occur." *Id.*

19       **6.    Report by Treating Physician Dr. Emily Thomas**

20       Emily Thomas, M.D., of San Francisco General Hospital was Plaintiff's co-treating

21   physician from May 2016 through at least May 2017.  AR 48.  Dr. Thomas submitted a treating

22   medical source statement concerning Plaintiff's impairments and their impact on her functionality.

23   Based on her treating relationship with Plaintiff, Dr. Thomas opined that Plaintiff could not carry

24   more than 10 pounds and that she could stand and walk about two hours a day and sit about four

25   hours a day.  AR 543.  She would need to change positions after 45 minutes of sitting or 10

26   minutes of standing and would require the opportunity to shift at will from sitting to standing and

27   walking. *Id.*

28       Dr. Thomas identified limitations in reaching, handling (gross manipulation) and

8

pushing/pulling because EDS "weakens connective tissue causing joint laxity and hypermobility."
AR 544. Dr. Thomas identified certain environmental restrictions, including that Plaintiff should
of avoid concentrated exposure to heat and cold and all exposure to "[f]umes, odors, dusts, gases,
poor ventilation, etc." *Id.* Dr. Thomas stated that given Plaintiff's EDS, "she needs braces to
prevent joint dislocation at her shoulders, elbows, and knees. Additionally, she is limited in her
ability [to] elevate legs, kneel, crawl, and balance for more than 10 minutes at a time." *Id.*
Finally, Dr. Thomas opined that Plaintiff's impairments would cause her to miss more than three
days of work per month. *Id.* A November 15, 2016 treatment note by Dr. Thomas states, among
other things: "Bilateral hallux varus: severe on exam. Likely will need repeat surgery. Reports
neuropathic pain from prior surgery." AR 529.

By letter dated May 25, 2017, Dr. Thomas provided the following diagnostic history of
Plaintiff:

> [Plaintiff] has been under my care since May 2016, and a patient at
> Zuckerberg San Francisco General Hospital since 2001. [Plaintiff]
> was first diagnosed with a valvular condition, Mitral Valve Prolapse,
> in 2000 that can contribute to shortness of breath and syncopal
> episodes. In 2011, [Plaintiff] was seen by our rheumatology clinic,
> who evaluated her for periodontal subtype of Ehlers Danlos
> Syndrome (EDS), and again in 2013, for recurrent gingi[v]al
> infections, high arched palate, joint hypermobility, and cardiac
> abnormalities. [Plaintiff] has been unable to perform strenuous
> manual labor that requires any lifting, crouching, or prolonged
> standing secondary to this condition since 2007. Since 2013,
> [Plaintiff] has been repeatedly evaluated and treated for EDS for joint
> hypermobility, dislocation, and resulting pain at our primary care
> clinic. She additionally undergoes close follow-up at our dental clinic
> for dental caries and gingival infections also related to her condition.
> Because of the burden of her disease, I support [Plaintiff] in her
> application for disability. Please feel free to contact me if you have
> any additional questions.

AR 48.

### III.  ISSUES FOR REVIEW

Plaintiff argues in her motion that: (1) the Commissioner erroneously dropped Plaintiff's
claim for Title XVI benefits, Pl.'s Mot. at 15–16; (2) the ALJ's step two findings of non-severity
as to her vision loss, right hand tightness, and left knee pain are factually and legally untenable, *id.*
at 16–17; (3) the ALJ failed at step two to even mention several of Plaintiff's medical conditions,
such as depressive disorder and her musculoskeletal issues, and failed to make findings as to

United States District Court
Northern District of California

whether they were severe or non-severe, *id.* at 17; (4) the ALJ's step three finding is "entirely defective on its face" because the ALJ does not identify what listings he considered and does not consider the combined impact of Plaintiff's impairments, *id.* at 17–18; (5) the ALJ committed multiple errors in weighing medical opinions, *id.* at 18–21, including by failing to provide legally valid reasons for disregarding the medical statements by two treating physicians, *id.* at 20–21, by ignoring virtually all the relevant criteria established by the Commissioner in the relative weighing of medical opinions, *id.* at 22–23, and by disregarding the consultative exam psychologist opinion, *id.* at 24; (6) the ALJ's disregard of Plaintiff's testimony was legally and factually baseless, *id.* at 25; (7) the ALJ's assessment of Plaintiff's RFC was riddled with errors, *id.* at 26; and (8) because the ALJ's finding at step four was based on an erroneous RFC determination, it cannot be sustained, *id.* at 27.

## IV.   STANDARD OF REVIEW

42 U.S.C. § 405(g) provides this Court's authority to review the Commissioner's decision to deny disability benefits, but "a federal court's review of Social Security determinations is quite limited." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015).  The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based on the application of improper legal standards.  *Id.*  Substantial means "more than a mere scintilla," but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. ___, 139 S. Ct. 1148, 1154 (2019) (cleaned up). Under this standard, which is "not high," the Court looks to the existing administrative record and asks "whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (cleaned up).

The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (citation omitted).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Id.* at 1010 (citation omitted).  If "the evidence can reasonably support either affirming or reversing a decision," the

1    Court must defer to the ALJ's decision.  *Id.* (citation omitted).

2         Even if the ALJ commits legal error, the ALJ's decision must be upheld if the error is

3    harmless, meaning "it is inconsequential to the ultimate nondisability determination, or that,

4    despite the legal error, the agency's path may reasonably be discerned, even if the agency explains

5    its decision with less than ideal clarity." *Brown-Hunter*, 806 F.3d at 492 (cleaned up).  But "[a]

6    reviewing court may not make independent findings based on the evidence before the ALJ to

7    conclude that the ALJ's error was harmless" and is instead "constrained to review the reasons the

8    ALJ asserts." *Id.* (cleaned up).

9                              **V.    DISCUSSION**

10   **A.    Framework for Determining Whether a Claimant Is Disabled**

11        A claimant is "disabled" under the Social Security Act (1) "if he is unable to engage in any

12   substantial gainful activity by reason of any medically determinable physical or mental

13   impairment which can be expected to result in death or which has lasted or can be expected to last

14   for a continuous period of not less than twelve months" and (2) the impairment is "of such severity

15   that he is not only unable to do his previous work but cannot, considering his age, education, and

16   work experience, engage in any other kind of substantial gainful work which exists in the national

17   economy."  42 U.S.C. § 1382c(a)(3)(A)-(B); *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012).

18   To determine whether a claimant is disabled, an ALJ is required to employ a five-step sequential

19   analysis.  20 C.F.R. § 404.1520(a)(1) (disability insurance benefits); *id.* § 416.920(a)(4) (same

20   standard for supplemental security income).  The claimant bears the burden of proof at steps one

21   through four.  *Ford v. Saul*, 950 F.3d 1141, 1148 (9th Cir. 2020) (citation omitted).

22        At step one, the ALJ must determine if the claimant is presently engaged in a "substantial

23   gainful activity," 20 C.F.R. § 404.1520(a)(4)(i), defined as "work done for pay or profit that

24   involves significant mental or physical activities."  *Ford*, 950 F.3d at 1148 (cleaned up).  Here, the

25   ALJ determined Plaintiff did not perform substantial gainful activity during the period from her

26   alleged onset date of December 23, 2011, through her date last insured of December 31, 2012.  AR

27   985.

28        At step two, the ALJ decides whether the claimant's impairment or combination of

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1    impairments is "severe," 20 C.F.R. § 404.1520(a)(4)(ii), "meaning that it significantly limits the

2    claimant's 'physical or mental ability to do basic work activities.'"  *Ford*, 950 F.3d at 1148

3    (quoting 20 C.F.R. § 404.1522(a)).  If no severe impairment is found, the claimant is not disabled.

4    20 C.F.R. § 404.1520(c).  Here, the ALJ determined Plaintiff had the following severe

5    impairments: Ehlers Danlos Syndrome (EDS), bilateral hallux valgus deformities (bunions),

6    allergies and degenerative disc disease.  AR 986.

7         At step three, the ALJ evaluates whether the claimant has an impairment or combination of

8    impairments that meets or equals an impairment in the "Listing of Impairments" (referred to as the

9    "listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404 Subpt. P, App. 1.  The listings

10   describe impairments that are considered "to be severe enough to prevent an individual from doing

11   any gainful activity."  *Id.* § 404.1525(a).  Each impairment is described in terms of "the objective

12   medical and other findings needed to satisfy the criteria of that listing."  *Id.* § 404.1525(c)(3).

13   "For a claimant to show that his impairment matches a listing, it must meet all of the specified

14   medical criteria.  An impairment that manifests only some of those criteria, no matter how

15   severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (footnote omitted).  If a

16   claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent

17   to the criteria of the diagnosis, she is conclusively presumed to be disabled, without considering

18   age, education and work experience.  20 C.F.R. § 404.1520(d).  Here, the ALJ determined Plaintiff

19   did not have an impairment or combination of impairments that meets the listings.  AR 987.

20        If the claimant does not meet or equal a listing, the ALJ proceeds to step four and assesses

21   the claimant's residual functional capacity ("RFC"), defined as the most the claimant can still do

22   despite their imitations (20 C.F.R. § 404.1545(a)(1)), and determines whether they are able to

23   perform past relevant work, defined as "work that [the claimant has] done within the past 15 years,

24   that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do

25   it."  20 C.F.R. § 404.1560(b)(1).  If the ALJ determines, based on the RFC, that the claimant can

26   perform past relevant work, the claimant is not disabled.  *Id.* § 404.1520(f).  Here, the ALJ

27   determined Plaintiff has the RFC to "perform light work as defined in 20 CFR 404.1567(b)

28   except: Claimant can occasionally stoop, crouch and bend. She can have no exposure to extreme

1   concentrations of pulmonary irritants such as fumes, dusts, and gases." AR 987. Based on this

2   RFC, the ALJ determined Plaintiff could perform past relevant work, including as a retail sales

3   clerk and telephone solicitor. AR 992.

4       At step five, the burden shifts to the agency to prove that "'the claimant can perform a

5   significant number of other jobs in the national economy.'" *Ford*, 950 F.3d at 1149 (quoting

6   *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002)). To meet this burden, the ALJ may rely

7   on the Medical-Vocational Guidelines (commonly known as "the grids"), 20 C.F.R. Pt. 404 Subpt.

8   P, App. 2,[5] or on the testimony of a vocational expert. *Ford*, 950 F.3d at 1149 (citation omitted).

9   "[A] vocational expert or specialist may offer expert opinion testimony in response to a

10  hypothetical question about whether a person with the physical and mental limitations imposed by

11  the claimant's medical impairment(s) can meet the demands of the claimant's previous work,

12  either as the claimant actually performed it or as generally performed in the national economy."

13  20 C.F.R. § 404.1560(b)(2). An ALJ may also use other resources such as the Dictionary of

14  Occupational Titles ("DOT").[6] *Id.* Here, the ALJ made no findings, having determined Plaintiff

15  was capable of performing past relevant work. AR 992.

16  **B.      Plaintiff's Claim for Title XVI benefits**

17      Plaintiff contends she has an outstanding claim for Title XVI benefits, and that the

18  Commissioner and ALJs "simply dropped it from consideration without notice or explanation"

19  between Plaintiff's March 9, 2017 ALJ hearing and the May 4, 2017 unfavorable decision. Pl.'s

20  Mot. at 16. Defendant argues that Plaintiff has failed to exhaust her Title XVI claim. ECF No. 18

21

22  ---

[5] The grids "present, in table form, a short-hand method for determining the availability and numbers of suitable jobs for a claimant." *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114–15 (9th Cir. 2006) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999)). They consist of three tables, for sedentary work, light work, and medium work, and a claimant's place on the applicable table depends on a matrix of four factors: a claimant's age, education, previous work experience, and physical ability. *Id.* "For each combination of these factors, [the grids] direct a finding of either 'disabled' or 'not disabled' based on the number of jobs in the national economy in that category of physical-exertional requirements." *Id.*

[6] The DOT classifies jobs by their exertional and skill requirements. 20 C.F.R. § 404.1566(d)(1); *Wischmann v. Kijakazi*, 68 F.4th 498, 502 (9th Cir. 2023) ("Although criticized as having many outdated job descriptions, the DOT is typically the starting point for VEs to identify the occupations relevant for each claimant's residual functional capacities.") (cleaned up); *Pinto v. Massanari*, 249 F.3d 840, 846 (9th Cir. 2001) (The "best source for how a job is generally performed is usually the Dictionary of Occupational Titles.").

United States District Court
Northern District of California

at 1–2.

### 1.      Legal Standard

All claimants must exhaust the administrative remedies set forth in 42 U.S.C. § 405(g) to invoke the district court's jurisdiction.  *See Bass v. Soc. Sec. Admin.*, 872 F.2d 832, 833 (9th Cir. 1989) (per curiam); *see also Shaibi v. Berryhill*, 883 F.3d 1102, 1109 (9th Cir. 2017) (amended Feb. 28, 2018) (holding that "when a claimant fails entirely to challenge a vocational expert's job numbers during administrative proceedings before the agency, the claimant forfeits such a challenge on appeal [in the district court], at least when that claimant is represented by counsel"). "Section 405(g) provides that a civil action may be brought only after (1) the claimant has been party to a hearing held by the Secretary, and (2) the Secretary has made a final decision on the claim." *Bass*, 872 F.2d at 833.  A decision is "not final until the Appeals Council denies review or, if it accepts a case for review, issues its own findings on the merits." *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012).  *See also Sims v. Apfel*, 530 U.S. 103, 106–07 (2000) ("SSA regulations provide that, if the Appeals Council grants review of a claim, then the decision that the Council issues is the Commissioner's final decision.  But if . . . the Council denies the request for review, the ALJ's opinion becomes the final decision."); *Luther v. Berryhill*, 891 F.3d 872, 876 (9th Cir. 2018) (ALJ's decision became final decision of the Commissioner when Appeals Council denied request for review).

### 2.      Analysis

On February 4, 2015, the Social Security Administration ("SSA") issued a Title II decision denial notice, AR 236–40, and a Title XVI decision denial notice, AR 241–45.  The Commission has not determined Plaintiff's eligibility for benefits after her date last insured beyond its initial denial of Title XVI benefits.  Plaintiff contends she filed a concurrent application for Title II and Title XVI benefits in 2014, Pl.'s Mot. at 15–16.  Defendant does not dispute that Plaintiff applied for both Title II and Title XVI benefits but contends that after the Commission issued notices of denial for both the Title II and Title XVI claims, Plaintiff only requested reconsideration of her Title II application.  ECF No. 18 at 1.  But Plaintiff's February 23, 2015 request for reconsideration specifies that she disagreed with the agency's determination regarding her

1    eligibility "for Supplemental Security Income benefits," which refers to Title XVI benefits.  AR

2    231.  Plaintiff wrote: "I disagree with the determination made on my claim for Supplemental

3    Security Income benefits because THE DOCTOR DID NOT RECEIVE ALL OF MY MEDICAL

4    RECORDS FROM SF GENERAL HOSPITAL.  HE DID NOT CONSIDER MY AGE 55+.  HE

5    DID NOT CONSIDER MY AUTO-IMMUNE DISEASE OR ALL MY COMPLICATIONS

6    WITH EHLER'S [sic] DANLOS SYNDROME."  *Id.*  The Social Security Administration

7    subsequently issued a Title II reconsideration denial notice, but did not appear to issue a Title XVI

8    reconsideration decision denial notice.  AR 246–50.

9        On August 26, 2015, Plaintiff requested review of the reconsideration denial by an ALJ.

10   AR 234–35.  Plaintiff's request for a hearing did not mention either Title II or Title XVI by name;

11   rather, Plaintiff wrote: "I request a hearing before an Administrative Law Judge.  I disagree with

12   the determination made on my claim for disability-worker or child benefits because the evaluation

13   is incorrect[.] I do have nerve damage I am disabled and unable to work."  AR 234.

14       At Plaintiff's March 9, 2017, hearing, Plaintiff's counsel at the time appeared to be under

15   the impression that the hearing was only for Title II benefits.  Still, the ALJ indicated he would

16   consider Plaintiff's eligibility for both Title II and Title XVI benefits based on Plaintiff's initial

17   application, even though the Commissioner had not provided notice of denial of that claim on

18   reconsideration:

19           ALJ: On September 23rd, 2014, you filed a claim for benefits under
             Titles II and XVI of the Social Security Act. . . .
20           . . .
             ATTY: . . .  And actually there was no indication of a Title XVI –
21           ALJ: There may not have been. I'm sorry if I misspoke that. She's
             currently alleged to have a Title XVI that she – her current application
22           is II and XVI.  The previous application may have been only a Title
             II.
23           ATTY: Maybe they put –made a mistake in putting this together,
             because let's see; Application for Disability Insurance Benefits,
24           9/23/14.
             ALJ: Right.
25           ATTY: And they made her Title II.
             ALJ: Well, they said II and XVI.
26           ATTY: Well, see, I don't – if you look at the top of the exhibit list.
             ALJ: Well, you know, I appreciate that.
27           ATTY: But I'm okay with it, with XVI.
             ALJ: No. I appreciate what the exhibit list says, but if you look at the
28           document . . .

                                          15

ATTY: Oh, I see. You know –
ALJ: -- it says that I'm applying for a Period of Disability for – and/or
all insurance benefits for which I am entitled under Title II or Part A
of XVI.

AR 53, 57–58.  Although the ALJ had considered Plaintiff's Title II and Title XVI claims at the

March 2017 hearing, the ALJ's May 4, 2017 unfavorable decision only mentioned Title II

benefits.  AR 30–43.

        In Plaintiff's subsequent December 16, 2018, motion for summary judgment on appeal to

this Court, Plaintiff discussed Titles II and XVI in a section providing an overview of applicable

Social Security law, and wrote that she was "seek[ing] review of review of a final adverse

disability determination by defendant acting Commissioner of Social Security . . . denying benefits

under Titles II and XVI of the Social Security Act . . ."  No. 3:18-cv-03235-TSH, ECF No. 21 at 1.

This Court granted a motion to remand.  However, at the February 18, 2020, hearing on remand,

Plaintiff's counsel expressly disclaimed that she was seeking Title XVI benefits:

ATTY: You know, I always try to get Title II for people because of
the Medicare aspect.
ALJ: Well, that's the only one at issue.
ATTY: I know, I know.
ALJ: So I mean, there is no Title XVI.
ATTY: I know there isn't, but that's what we would have to resort to
after she -- you know, she would have to put in a new application so.

AR 643.  The ALJ's subsequent April 7, 2020, unfavorable decision only mentioned Title II.  AR

560–72.  In the following federal action, Plaintiff argued in a footnote that the ALJ erred by not

deciding her Title XVI claim.  Case No. 3:20-cv-5360 TSH, ECF No. 30 at 10 n.3.  The Defendant

never responded, and the Court did not rule on the issue, because the parties stipulated to a

remand.  AR 1047–48.  At the subsequent July 12, 2022 hearing on remand, neither the ALJ nor

Plaintiff mentioned either title of the Social Security Act.  *See* AR 1000–23 (transcript of July 12,

2022 hearing); AR 1002 (commencing "hearing and your ongoing appeal following the District

Court remand of [the ALJ's] unfavorable decision," but not specifying benefits at issue).  After

that, the first instance in which Plaintiff attempted to raise a Title XVI argument was in this

motion for summary judgment.  ECF No. 15 at 15–16.

        Because Plaintiff's counsel expressly disclaimed that Plaintiff had an outstanding claim for

16

1   Title XVI benefits during administrative proceedings before the agency, and because there is

2   nothing to indicate that on remand Plaintiff pressed her Title XVI claim before the ALJ, Plaintiff

3   has waived her Title XVI claim.  The Court cannot say that the ALJ erred in 2020 by not deciding

4   the Title XVI claim in the face of Plaintiff's counsel's express disclaimer of such a claim.  Nor can

5   the Court say the ALJ erred in 2022, given the previous disclaimer and the lack of any evidence

6   that Plaintiff asserted she had a Title XVI claim during remand proceedings before the ALJ.

7   Accordingly, Plaintiff has forfeited the ability to raise the issue of her Title XVI application on

8   appeal.

9   **C.      Weight Afforded to Medical Opinions**

10         Plaintiff contends that the ALJ committed several errors in weighing medical opinions.

11  Pl.'s Mot. at 18–24.  Plaintiff contends that the ALJ failed to provide legally adequate reasons for

12  disregarding the medical source statements by treating physicians Dr. Stern and Dr. Thomas, *id.* at

13  20–21; that the ALJ failed to consider the factors outlined in 20 C.F.R. § 404.1527(c) in weighing

14  the medical opinions, *id.* at 22–23; and that the ALJ erred by disregarding the consultative exam

15  psychologist opinion, *id.* at 24.

16         On remand, the Appeals Council directed the ALJ to "[g]ive consideration to the treating

17  source opinion pursuant to the provisions of 20 CFR 404.1527, and explain the weight given to

18  such opinion evidence."  The Appeals Council's directions noted that the ALJ "may request the

19  treating source provide additional evidence and/or further clarification of the opinion and medical

20  source statements about what the claimant could still do despite the impairment through December

21  31, 2012 (20 CFR 404.1520b).  The Administrative Law Judge may enlist the aid and cooperation

22  of the claimant's representative in developing evidence from the claimant's treating source."  AR

23  982.  In evaluating the medical opinions regarding Plaintiff's alleged disability, the ALJ explained

24  "there was no opinion evidence provided contemporaneously" from between December 23, 2011,

25  through Plaintiff's date last insured of December 31, 2012.  AR 990.  However, the ALJ

26  acknowledged that he was to "consider the opinions issued after the date last insured."  *Id.*

27         **1.      Legal Standard**

28         In Social Security disability cases, "[t]he ALJ must consider all medical opinion

United States District Court
Northern District of California

17

evidence." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).  For Social Security claims filed before March 27, 2017, the Ninth Circuit "developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527).  Courts "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, the opinion of a treating physician is entitled to more weight than the opinion of an examining physician, and more weight is given to the opinion of an examining physician than a non-examining physician.  *See Ghanim v. Colvin*, 763 F.3d 1154,1160 (9th Cir. 2014).  "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).  However, the ALJ "may disregard the treating physician's opinion whether or not that opinion is contradicted." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198. "Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal citation omitted). "This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [the ALJ's] interpretation thereof, and making findings . . . The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.*

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [SSA] considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of

examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(c)(2)(i)-(ii)).

> Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the degree of understanding a physician has of the [Social Security] Administration's 'disability programs and their evidentiary requirements' and the degree of his or her familiarity with other information in the case record.

*Id.* (citing 20 C.F.R. § 404.1527(c)(3)-(6)).

Further, "[t]he ALJ has a duty to develop the record . . . even when the claimant is represented by counsel." *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991).

### 2. Analysis

#### a. Relative Weighing of Medical Opinions

The ALJ afforded "great weight" to only one medical opinion, that of consultative examiner Dr. Seung Ha Lim, provided in July 2013. AR 990. The ALJ concluded that Dr. Lim's opinion, while also submitted outside the period at issue, was "the only examination sufficiently close to the claimant's date last insured to be considered reflective of the claimant's prior functioning." AR 990. The ALJ concluded that "[t]here is no evidence during the period at issue to contradict the findings as supported by [Dr. Lim's] exam[.] [T]hus his opinion is given great weight." *Id.*

The ALJ gave "little weight," in contrast, to the opinions of two treating providers. Regarding Dr. Rachel Stern's June 2015 medical source statement, the ALJ concluded: "This opinion is given little weight as the record does not support the extreme limitations [Dr. Stern] found, including missing work 5 times per month. The record shows that she attends all doctors' appointments and gives no indication that her symptoms are severe enough to limit her so significantly." AR 991. Regarding Dr. Emily Thomas's January 2017 medical source statement, the ALJ "g[ave] her statement and limitations little weight as it is not consistent with the medical evidence, including her own physical examinations and treatment notes. As stated above, there is very little indication that she likely be absent from work 3 times per month. Moreover, while

19

examinations showed some tenderness, reduced range of motion and sensation, and hypermobility, the opinion that she could only stand and walk for 2 hours or lift no more than 10 pounds is unsupported by the record as detailed previously."  AR 991.

The ALJ likewise gave "little weight" to the December 2014 opinion of consultative examiner Randy Kolin.  The ALJ reasoned that Dr. Kolin's opinion "was issued well after the date last insured and even when considering if the limitations could apply retroactively, as noted previously, although claimant had been referred for mental health treatment, there is no indication that she followed through with the referrals."  AR 986.  The ALJ gave "only partial weight" to the December 2014 opinion of consultative examiner Dr. Ognjen Petras, reasoning: "[T]his exam was two years after the claimant's date last insured.  It is found to be too remote to provide insight into the claimant's function in 2011/2012, particularly when Dr. Petras's narrative does not support some of his limitations, thus his opinion is given only partial weight."  AR 990.  Finally, the ALJ gave the opinions of non-treating, non-examining State agency consultants Drs. Bradus and Clift "reduced weight[,] as since their review additional evidence was discovered related to the period at issue which they did not have the opportunity to consider.  As well, there had been material changes in the rules, regulations or law for considering disability claims thus the case should have been considered on its merits."  AR 992.

The Court finds the ALJ committed reversible error in his weighing of the medical opinions in Plaintiff's case.  Plaintiff's claim was filed in September 2014, meaning that the standards for weighing medical evidence set forth in 20 C.F.R. § 404.1527(c) apply to her claim.  Those regulations require the ALJ to consider factors, such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, and specialization, "when a treating source's opinions are not given controlling weight."  *See Garrison*, 759 F.3d at 1012 n.11.  Under the applicable standards, the ALJ was required to provide "specific and legitimate reasons supported by substantial evidence in the record" when rejecting the opinions of a treating physician, "[e]ven if the treating doctor's opinion is contradicted by another doctor."  *Reddick*, 157 F.3d at 725 (internal citation omitted).  The ALJ appears to have completely ignored most of these factors.  The ALJ's decision failed to

even mention the length of treatment relationship, frequency of examination, or nature and extent of the treatment relationship of the two treating sources whose opinions he rejected.  AR 990–92.  As described in more detail below, it is also unclear whether the ALJ applied any of the other factors set forth in 20 C.F.R. § 404.1527(c).

In assessing the weight of the medical opinions, the ALJ is not foreclosed from considering the temporal proximity of the opinions (and of the evidence upon which they were based) to the period at issue.  *See* 20 C.F.R. § 404.1527(c)(6) (providing for consideration of "other factors" "which tend to support or contradict the medical opinion.").  But it does not follow that the opinion closest in time to Plaintiff's date last insured should presumptively be afforded "great weight" over the opinion evidence of multiple treating physicians and over the record as a whole, particularly in the absence of *any* contemporaneous medical testimony.  And it constitutes reversible error to reject the opinion evidence of a treating physician on this basis without providing "specific and legitimate reasons supported by substantial evidence in the record."  *See, e.g.*, *Reddick*, 157 F.3d at 725.  The Court finds the ALJ failed to adequately apply the factors set forth in 20 C.F.R. § 404.1527(c) and failed to provide specific and legitimate reasons supported by substantial record evidence for rejecting the opinions of both treating physicians.

### a.    Dr. Stern's Treating Physician Medical Source Statement

The ALJ gave Dr. Stern's opinion "little weight as the record does not support the extreme limitations she found, including missing work 5 times per month. The record shows that she attends all doctors' appointments and gives no indication that her symptoms are severe enough to limit her so significantly."  AR 991.  As a preliminary matter, the ALJ's evaluation of Dr. Stern's opinion fails to adequately consider the factors set forth in 20 C.F.R. § 404.1527(c).  First, the ALJ fails to take into account Dr. Stern's treatment relationship with Plaintiff, the length of treatment and frequency of examination, and nature and extent of the relationship.  The ALJ describes Stern as a "treating provider" but simply states that she "completed a medical assessment in June 2015" and does not mention that Plaintiff had at least six doctor's appointments with Dr. Stern in the year leading up to Dr. Stern's opinion (AR 406, 417, 422, 432, 435, 509, 512), as well as numerous other appointments with specialists within the same hospital system or to whom Dr.

United States District Court
Northern District of California

Stern had referred Plaintiff.  *See* AR 411, 416, 421, 425–26, 428–29, 439, 441, 444, 454, 458 (progress notes from medical appointments with other providers at San Francisco General Hospital from February 2014 through April 2015).  *See Lacy v. Saul*, No. 19-cv-0409-SI, 2019 WL 4845965, at *8 (N.D. Cal. Oct. 1, 2019) (finding ALJ failed to consider factors set out in C.F.R. § 404.1527(c) because "[t]he ALJ did not state that Dr. Weber was plaintiff's treating psychiatrist or that Dr. Weber met with her four times during an eight-month period.  The ALJ did not refer to Dr. Weber's area of specialization as a psychiatrist, but simply referred to him as 'Armeen Weber, MD, her medication prescriber.'").

Regarding the specific example the ALJ cited to support his conclusion as to Plaintiff's likely attendance at work, the Court agrees with Plaintiff that her attendance at occasional and relatively brief doctor's appointments is irrelevant to an inquiry into "whether her . . . medical conditions would, under the physical and emotional demands of a full-time job, cause her to miss five days a month of work."  Pl.'s Mot. at 21.  And although the ALJ concluded that "the record does not support" the limitations Dr. Stern found, he fails to cite any specific evidence from the record in support of this conclusion.  AR 991.

The ALJ further concluded:

> Dr. Stern also noted that the claimant was underweight, and indicated due to body mass she should not lift as she is at risk for dislocation however possibility of a future injury does not support limitations per se and claimant has been limited to light work activity by the undersigned, while Dr. Stern did not identify a particular weight limit.

AR 991.  But Dr. Stern attributed Plaintiff's exertional limitations to several factors along with her body mass, including "joint pain/hypermobility, [lumbar] spine nerve compression, cardiac fatigue" and "vascular fragility . . . rupture could occur."  AR 514.  *See also* AR 518 (email from Robert L. Nussbaum, MD, discussing genetic testing to rule out Marfan syndrome and EDS type IV "given the uterine rupture history.").  In light of these extensive findings and the severity of some of the risks of overexertion Dr. Stern reported (e.g., "rupture"), the ALJ should have developed the record further by inquiring as to what weight limits Dr. Stern would set, the likelihood of the types of injuries she identified, the scope of those potential injuries if unclear

1  (i.e., whether Dr. Stern was referring to organ, blood vessel, or joint rupture), and whether any of

2  those injuries would be life-threatening.  *See Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)

3  ("If the ALJ thought he needed to know the basis of [a doctor's] opinions in order to evaluate

4  them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians

5  or submitting further questions to them.").

6          Dr. Stern's treating medical source statement also contained extensive findings on

7  Plaintiff's impairments, as well as some background information about Plaintiff's EDS.  AR 513–

8  15.  Dr. Stern opined that Plaintiff shows "progressive limitations of joint motion" and

9  characterizes EDS as "degenerative," which indicates that Plaintiff's health in 2014 and 2015

10  would not fully capture the scope of her limitations during the prior period in which she was

11  insured.  AR 513.  However, Dr. Stern's opinion also provided background information about

12  Plaintiff's EDS and limitations imposed due to the nature of this genetic connective tissue

13  disorder.  AR 514 (citing "loose joints," "ligament laxity," and "vascular fragility" in explanation

14  of limitations with respect to standing; bending, stooping, or climbing; and exertional limitations,

15  respectively).  These lifelong impairments, based on mutations in the genes that instruct the body

16  how to make collagen (*see* AR 516) would apply just as equally to the period in which Plaintiff

17  was insured as they would to the period in which Dr. Stern treated Plaintiff.  The ALJ did not

18  provide any specific reasons, let alone cite to substantial evidence in the record, for discounting

19  Dr. Stern's opinion as to these findings.

20          Accordingly, the Court finds that the ALJ failed to provide legally adequate reasons for

21  giving little weight to Dr. Stern's opinion.

22                    a.      **Dr. Thomas's Treating Physician Medical Source Statement**

23          As with his assessment of Dr. Stern's medical source statement, the ALJ's assessment of

24  Dr. Thomas's medical opinion fails to take into account the deference owed to the opinions of

25  treating physicians for claims filed before 2017.  AR 991–92.  Save for a passing reference in its

26  final sentence, the ALJ's summary of Dr. Thomas's medical report fails even to mention that Dr.

27  Thomas was a treating physician.  AR 991.  Although the ALJ discussed Dr. Thomas's opinion in

28  some detail, the Court finds he failed to provide specific and legitimate reasons supported by

United States District Court
Northern District of California

23

substantial record evidence for rejecting Dr. Thomas's opinion.

Regarding Dr. Thomas's January 2017 medical source statement, the ALJ "g[ave] her statement and limitations little weight as it is not consistent with the medical evidence, including her own physical examinations and treatment notes." AR 991. However, the ALJ did not cite *any* record evidence of the physical examinations and treatment notes he found apparently inconsistent with Dr. Thomas's opinion. *Id.* The ALJ stated that "claimant refused surgical intervention, around the time of the original injury despite what appeared to be significant objective findings and went on to work at substantial gainful activity levels for several years thereafter." AR 991. But the original injury was in 2000 (AR 529), many years before the claimed onset of disability. The only record evidence the ALJ cited to undercut Dr. Thomas's statement was Dr. Thomas's treatment notes from a November 15, 2016, appointment, which the ALJ said showed "claimant continued to be reluctant to seek care and that she declined referral to physical therapy and referral to an orthopedist or other specialist to treat her multiple complaints." AR 991–92. The notes from that appointment state that Plaintiff was reluctant to seek care in connection with "finger stiffness." AR 528–29. She declined a referral with respect to "dentistry" and "podiatry." AR 529. The Court does not see that she declined a referral to an orthopedist. It is unclear what inference can be drawn from her declination of physical therapy, as that paragraph in the notes discusses her concern that she has Marfan syndrome and wanted genetic testing. These notes do not generally undermine Dr. Thomas's statement. The notes also state that "Ucsf medical genetics also recommended a low threshold to evaluate back pain with an MRI because of [Plaintiff's] ligamentous instability from her EDS." AR 529. And the notes state: "Additional pertinent information is below: 57 year dol woman, Ehlers-Danlos syndrome, tricuspid-valve no change in AV root on recent echo, right-hand unable to move a/p 1. – 2. Right back numbness – ra." AR 531.

In rejecting Dr. Thomas's opinion that Plaintiff's impairments would cause her to miss at least three days of work per month, the ALJ also concluded, "[a]s stated above, there is very little indication that she likely be absent from work 3 times per month." *Id.* Again, the evidence the ALJ cited in support of his conclusion that Plaintiff's impairments would not cause her to miss

United States District Court
Northern District of California

1    work—her ability to attend doctor's appointments—does not actually undercut a treating

2    physician's opinion that Plaintiff's impairments would cause her to miss work.  The ALJ further

3    concluded that "while examinations showed some tenderness, reduced range of motion and

4    sensation, and hypermobility, the opinion that she could only stand and walk for 2 hours or lift no

5    more than 10 pounds is unsupported by the record as detailed previously."  AR 991.  The ALJ did

6    not provide any legitimate reasons for discounting this statement, let alone any record evidence

7    indicating Plaintiff could stand and walk for longer periods or lift more than 10 pounds.

8         Accordingly, the Court finds the ALJ failed to provide legally adequate reasons for giving

9    little weight to Dr. Thomas's opinion.

10                    **b.    Other Medical Testimony**

11        The Court also finds that the ALJ's reasoning for affording "only partial weight" to the

12   medical testimony of Dr. Ognjen Petras is insufficient to support the ALJ's factual determinations

13   regarding Dr. Petras's opinion.  The ALJ gave only partial weight to Dr. Petras's December 2014

14   opinion because it was "too remote to provide insight into the claimant's function in 2011/2012,

15   particularly when Dr. Petras's narrative does not support some of his limitations[.]"  AR 990.  In

16   particular, the ALJ found that Dr. Petras's narrative did not support his recommendation that

17   Plaintiff would "benefit from a cane when walking more than 100 feet."  AR 396.  The ALJ

18   concluded that the evidence did not support that a cane was medically necessary during the

19   relevant time period "or even that a cane was medically necessary as of [Dr. Petras's] examination

20   date as his prior observations seem to reflect she was able to ambulate without a cane."  AR 990.

21   But Dr. Petras also observed that Plaintiff's "posture was mildly stooped forward while walking"

22   and that she "walked at a slow pace only," both in the clinic and observed from the clinic windows

23   walking to the clinic.  AR 394.  In documenting Plaintiff's medical history, Dr. Petras reported

24   that Plaintiff explained "she frequently feels 'dizzy' while walking, and has had (sic) dizzy for

25   several years."  AR 390.  In his recommendation that Plaintiff alternate positions, Dr. Petras noted,

26   "Claimant cannot walk at a normal pace."  AR 395.  The ALJ even acknowledged that Dr. Petras

27   "made an additional notation that [Plaintiff] carried a cane and used it to walk to and from the

28   building as well as while she was in the clinic."  AR 990.  The ALJ nonetheless found Dr. Petras's

United States District Court
Northern District of California

25

1    recommendation unreliable because "there is no prescription or notation from a treatment provider

2    during the instant period indicating she must use a cane.  Furthermore, there is no documentation

3    describing the circumstances for which a cane would be needed."  AR 991.  Although not a

4    treating provider, Dr. Petras specified that a cane would be beneficial for "walking more than 100

5    feet," AR 396, and Plaintiff indicated she was prescribed a cane for walking in 2009 (AR 309),

6    well before any of the medical opinions the ALJ considered were elicited, and predating the period

7    for which Plaintiff has outstanding claims at issue.

8          The ALJ also found that Dr. Petras's narrative did not support his conclusion that Plaintiff

9    would "have to alternate sitting with standing/walking every 15–30 minutes," AR 395, 990–91.

10   The ALJ writes that Dr. Petras "stated that [Plaintiff] had to alternat[e] positions, however he

11   noted she appeared comfortable while seated, she was able to walk to and from the exam room

12   without assistance, she could get on and off the exam table without assistance and she could get up

13   from a supine position without assistance."  AR 990.  But these isolated and limited examples of

14   mobility in no way undercut Dr. Petras's conclusion that Plaintiff would need to alternate sitting

15   with standing or walking.  And this conclusion was consistent with the note Dr. Petras made that

16   Plaintiff's "back pain becomes worse, and her feet become numb after sitting more than 30

17   minutes at a time" (AR 390), with Plaintiff's complaints of dizziness while walking (*id.*), and with

18   Dr. Petras's observations of tenderness in Plaintiff's right lower back (AR 392) and that palpation

19   of the sole of her left foot triggered neuropathic pain (AR 393).

20         The ALJ's evaluation of Dr. Petras's opinion further indicates that the ALJ failed to

21   consider 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with

22   the record as a whole, the more weight we will give to that medical opinion") in evaluating the

23   medical opinions.  The conclusions the ALJ claims are unsupported are overwhelmingly

24   consistent with the record as a whole, including the statements by both treating physicians, and

25   even with several observations made by examining physician Dr. Lim (if not with Dr. Lim's

26   ultimate conclusions as to Plaintiff's limitations).  *See, e.g.*, AR 383, 385 (Dr. Lim's observations

27   that Plaintiff exhibited "pain on motion, paravertebral tenderness, and decreased range of motion

28   of the back," and noting Plaintiff's "slow gait [and] complaining of back pain," although Dr. Lim

United States District Court
Northern District of California

26

1   opined that Plaintiff "does not require the use of assistive devices for ambulation at this time");

2   AR 514 (notes from Dr. Stern that Plaintiff's "balance is dangerously unstable" and noting "loose

3   joints – no standing"); *id.* (Dr. Stern's opinion that Plaintiff could walk or stand one hour and sit

4   two to four hours in an eight-hour day, and would require a change of position after standing for 5

5   to 10 minutes, walking for 15 minutes or sitting for 15 to 20 minutes); AR 543 (Dr. Thomas's

6   opinion that Plaintiff would need to change positions after 45 minutes of sitting or 10 minutes of

7   standing and would require the opportunity to shift at will from sitting to standing and walking);

8   AR 544 (Dr. Thomas's opinion that given Plaintiff's EDS, "she needs braces to prevent joint

9   dislocation at her . . . knees.  Additionally, she is limited in her ability [to] . . . balance for more

10   than 10 minutes at a time.").  *See also* AR 341 (Plaintiff's report that her illnesses, injuries or

11   conditions affect her ability to bathe because they are "cause for falling from dizziness, weakness,

12   pain.")

### c.       Opinions from Consultative Exam Psychologist Dr. Kolin

14         The ALJ gave "little weight" to the December 2014 opinion of consultative examiner

15   Randy Kolin, who conducted a "comprehensive mental status evaluation" of Plaintiff, and did not

16   include any of Dr. Kolin's findings in his evaluation of Plaintiff's RFC.  AR 399–404.  The ALJ

17   did not indicate in his decision that Dr. Kolin's opinion was contradicted by any other doctor's

18   opinion.  Accordingly, in order to reject Dr. Kolin's opinion, the ALJ was required to "state clear

19   and convincing reasons that are supported by substantial evidence."  *Ryan*, 528 F.3d at 1198.  The

20   Court finds the ALJ failed to do so.

21         As with most of the medical opinions the ALJ considered, the ALJ discounted Dr. Kolin's

22   opinion because it "was issued well after the date last insured."  AR 986.  However, the Court

23   finds that timing alone was not a clear and convincing reason to wholly reject Dr. Kolin's

24   uncontradicted testimony, particularly given indications within Dr. Kolin's opinion that Plaintiff's

25   mental health symptoms may be longstanding.  *See* AR 399 (noting in patient history that Plaintiff

26   "reports first experiencing the above described psychiatric symptoms since childhood"), 404

27   (finding that "[g]iven the claimant's psychiatric and treatment history and results of this

28   evaluation, it appears that the mental health symptoms may be chronic in nature.  Given the

*United States District Court*
*Northern District of California*

1    current diagnosis and past mental health involvement, it appears that the claimant's current mental

2    health condition will not abate on its own within a one-year period.").

3         In discounting Dr. Kolin's findings, the ALJ continued, "even when considering if the

4    limitations could apply retroactively . . .  although claimant had been referred for mental health

5    treatment, there is no indication that she followed through with the referrals." AR 986.  Plaintiff's

6    failure to follow through with referrals is not a clear and convincing reason to reject Dr. Kolin's

7    uncontradicted examining source opinion regarding Plaintiff's mental health. *See Regennitter v.*

8    *Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299–300 (9th Cir. 1999) (failure to seek mental

9    health treatment due to poverty was not a valid reason for ALJ to reject examining psychologist's

10   opinion); *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) ("it is a questionable practice to

11   chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation"

12   (internal quotations omitted).

13        Finally, the ALJ repeatedly stated that Dr. Kolin merely opined that Plaintiff's "mental

14   health symptoms 'might' hinder social or occupational functioning" and states that Dr. Kolin's

15   "ambivalent statement . . . does not establish that she indeed had functional limitations in this

16   area." AR 986.  But here the ALJ misquotes Dr. Kolin and completely ignores the extensive list

17   of functional limitations Dr. Kolin found.  Rather, on the final page of Dr. Kolin's opinion, Dr.

18   Kolin writes that "from a psychological standpoint alone . . . [g]iven the assessment and

19   diagnosis," Plaintiff was "moderately limited" in the "ability to accept instructions from

20   supervisors and interact with coworkers and the public" and was "mildly limited" in the abilities

21   "to adequately perform complex tasks," "to perform basic work activities and to be safety

22   conscious on a consistent basis without special or additional instructions," "to maintain regular

23   attendance in the workplace," "to complete a normal workday or workweek without interruptions

24   from a psychiatric condition," and "to handle normal work related stress from a competitive work

25   environment." AR 404.  Underneath this summary of limitations, Dr. Kolin wrote that "[m]ental

26   health symptoms may hinder social or occupational functioning at this time." *Id.*  Dr. Kolin's use

27   of "may" is far from ambivalent given his declarative findings as to Plaintiff's limitations.

28        Accordingly, the Court finds the ALJ committed reversible error in evaluating Dr. Kolin's

United States District Court
Northern District of California

28

1   opinion.

2   **D.      Plaintiff's Testimony**

3          Plaintiff argues that the ALJ erred in disregarding Plaintiff's testimony.  Pl.'s Mot. at 25.

4          **1.      Legal Standard**

5          The Ninth Circuit has "established a two-step analysis for determining the extent to which

6   a claimant's symptom testimony must be credited." *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th

7   Cir. 2017).  "First, the ALJ must determine whether the claimant has presented objective medical

8   evidence of an underlying impairment which could reasonably be expected to produce the pain or

9   other symptoms alleged." *Id.*  "Second, if the claimant meets this first test, and there is no

10  evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her

11  symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter v.*

12  *Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (cleaned up).  If the ALJ's assessment "is supported

13  by substantial evidence in the record, [courts] may not engage in second-guessing." *Thomas*, 278

14  F.3d at 959 (cleaned up).

15         "At the same time, the ALJ is not required to believe every allegation of [symptoms], or

16  else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. §

17  423(d)(5)(A)." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (citation and internal

18  quotations omitted), *superseded on other grounds by* 20 C.F.R. § 404.1502(a).  In determining

19  whether an individual's symptoms will reduce their capacities to perform work-related activities or

20  abilities to function, "the ALJ may consider inconsistencies either in the claimant's testimony or

21  between the testimony and the claimant's conduct; unexplained or inadequately explained failure

22  to seek treatment or to follow a prescribed course of treatment; and whether the claimant engages

23  in daily activities inconsistent with the alleged symptoms." *Id.* (citations and internal quotation

24  marks omitted).  The clear and convincing standard "isn't whether our court is convinced, but

25  instead whether the ALJ's rationale is clear enough that it has the power to convince." *Smartt v.*

26  *Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022).

27         **2.      Analysis**

28         In his unfavorable decision, the ALJ found "that the claimant's medically determinable

United States District Court
Northern District of California

1   impairments could reasonably be expected to cause the alleged symptoms; however, the

2   claimant's statements concerning the intensity, persistence and limiting effects of these symptoms

3   are not entirely consistent with the medical evidence and other evidence in the record for the

4   reasons explained in this decision."  AR 988.

5               a.       **Failure to Develop the Record at Hearing**

6          In his unfavorable decision, the ALJ points out Plaintiff "testified extensively during the

7   instant hearing regarding her pains and limitations in recent years, for example describing that she

8   had COVID twice and related symptoms," even though "the period under consideration is from

9   December 2011 to December 2012."  AR 988.  However, the ALJ did not ask Plaintiff any

10  questions about her physical limitations, pain, or other symptoms during the time period at issue at

11  any point during the July 12, 2022 hearing.  *See* AR 1002–23.  Instead, the ALJ asked Plaintiff,

12  using the present tense, "So what prevents you from working?"  AR 1003.  The ALJ did not

13  follow up with any questions about the time period at issue, nor did he ask Plaintiff for

14  clarification about when symptoms began for the testimony elicited.  AR 1003–04.  The ALJ

15  noted that Plaintiff "did testify that she had a water rafting accident (date not specified) and

16  reported that she has had back pain since then."  AR 988.  Although the ALJ points out that these

17  facts are unknown, he never asked Plaintiff for more information to determine whether this pain

18  was present when she was last insured or its severity.  Similarly, the ALJ noted that Plaintiff "also

19  described having surgery on her foot in 1980 where they cut her tendon and did not heal correctly

20  and has resulted in pain and limitation. [She] indicated it is more comfortable for her to walk

21  which exacerbates her foot pain so she cannot walk longer than 10 minutes."  AR 988.  Again, the

22  ALJ did not ask any questions at the hearing to glean more information about whether these

23  symptoms were present when Plaintiff was last insured or their severity.  AR 1004.  Accordingly,

24  the Court finds the ALJ erred in failing to ask questions at the hearing regarding Plaintiff's pain

25  and impairments during the time period at issue.  This error was not harmless as it impacted the

26  ALJ's RFC determination.

27              b.       **Reasons for Rejecting Plaintiff's Subjective Symptom Testimony**

28         The ALJ concluded that Plaintiff's "physical examinations do not support the severity of

1   limitation she alleges during the period under consideration." AR 989.  As an example, the ALJ

2   noted that Plaintiff had "participated in physical therapy and was discharged after having met all

3   her goals." *Id.*  Plaintiff had three physical therapy treatments in 2012 for lower back pain; the

4   physical therapist's notes from Plaintiff's last appointment, in August 2012, state that Plaintiff

5   "has met goals" and "reports her back has been feeling much better, but her [left] big toe has been

6   troublesome and painful." AR 1194.  Plaintiff's physical therapy records support a finding that

7   Plaintiff's lower back pain was responsive to physical therapy treatment, and are consistent with a

8   finding that her lower back pain may not have been as severe as she alleges during the relevant

9   period.  Still, these physical therapy records do not contradict the severity of other limitations

10  Plaintiff alleges; they confirm the pain related to her toe, as well as "hip/gluteal and pelvic pain

11  that increases with walking or sitting/standing for too long." AR 1195.  Plaintiff's initial

12  evaluation notes that she could "walk 3-4 blocks, but has pain as soon as she starts walking." AR

13  1197.  The physical therapy notes do not describe Plaintiff's limitations when she was discharged

14  after three appointments.  Although the physical therapy records are from July and August 2012,

15  squarely within the time period at issue, ALJ did not ask Plaintiff about whether she recalled going

16  to physical therapy, her pain and limitations before and after, or whether she was able to conduct

17  the exercises independently and safely upon discharge (*see* AR 1195, noting that Plaintiff

18  "requires multiple verbal cues and demonstration to learn exercises but tolerated all exercises").

19       Although the ALJ concluded that Plaintiff's testimony concerning the intensity, persistence

20  and limiting effects of her symptoms was not entirely consistent with evidence in the record, the

21  ALJ's decision did not clearly connect Plaintiff's subjective testimony to the evidence he

22  considered inconsistent with it.  Nor did the ALJ point to any inconsistencies between Plaintiff's

23  testimony and her conduct, or to any daily activities inconsistent with her alleged symptoms.  The

24  ALJ pointed to Plaintiff's failure to seek treatment or to follow a prescribed course of treatment to

25  discount some of her complaints.  *See* AR 990 (stating Plaintiff's "complaints were generally

26  nonspecific and she refused routine diagnostic tools and treatment modalities such as blood draw,

27  shot, pain medication or x-rays to assess and diagnose the source of her complaints, despite her

28  allegation that she could not perform even sedentary work activity.").  But the portion of the

United States District Court
Northern District of California

31

1    record to which the ALJ cites here is not actually about the Plaintiff's subjective testimony

2    regarding the severe impairments the ALJ found – Ehlers Danlos syndrome, bilateral hallux

3    valgus deformities, allergies, and degenerative disc disease.  *See* AR 445 (treatment note from

4    June 2014 doctor's visit reporting that Plaintiff "states that she is sick again. . . . [Plaintiff] has

5    multiple sick complaints at each visit that are non-specific. . . . [S]he cannot state[] what feels bad

6    but just that she 'has a virus.' . . . She states that she does not want blood drawn, or radiation from

7    a CXR, or a shot today. She just wants me to tell her what she has.").  It is not clear that Plaintiff

8    was even offered the diagnostic tools and treatment modalities the ALJ claims she refused.  *Id.*

9    And to the extent Plaintiff actually refused pain medication, the record contains repeated

10   references to Plaintiff's allergies and intolerances to pain medication.  *See, e.g.*, AR 509 (noting

11   vicodin allergy), 514 (noting include "gastrointestinal intolerance to pain meds"), 930 (noting

12   allergies to vicodin and aspirin).

13          The ALJ also points out that Plaintiff had refused a heart monitor in spite of her complaints

14   of heart palpitations, fatigue and shortness of breath (AR 988, 990).  However, the record

15   repeatedly explains that Plaintiff was offered a ZioPatch stick-on heart monitor and refused due to

16   fear of adhesives (perhaps unsurprising given Plaintiff's extensive allergies and her diagnosis of a

17   disorder that causes weak connective tissue).  *See* AR 434, 437; *see also* AR 446 (noting heart

18   rhythm monitor referral made in October 2013 and describing ZioPatch).  The record shows

19   Plaintiff's treating physician took this concern seriously and was looking into alternatives to the

20   stick-on monitor (AR 437), but it does not indicate whether Plaintiff was ultimately offered an

21   alternative.  The ALJ further concluded "it does not appear that the claimant has cardiac

22   involvement with her EDS."  AR 988.  This conclusion is not supported by Plaintiff's medical

23   records.  *See, e.g.*, AR 437 (treatment note from Dr. Stern noting that a rheumatologist "agree[d]

24   with dx of EDS.  Major manifestation is cardiac, echo showed borderline enlarged aortic root.");

25   AR 529 (note from Dr. Stephanie Rogers that "[c]urrent manifestations are extensive periodontal

26   disease, joint hyperlaxity/ligamentous dysfunction and a borderline-enlarged aortic root.").

27   Although Plaintiff's most recent echocardiograms no longer showed signs of mitral valve

28   prolapse, the results of those tests still included consistently abnormal findings.  *See, e.g.*, AR 538

(June 2014 echocardiogram results indicating abnormal findings including tricuspid valve prolapse); AR 536 (November 2016 echocardiogram results indicating aortic root dilation). Accordingly, although Plaintiff's reluctance to follow up with a heart monitor would make it difficult to evaluate the extent to which her symptoms were due to cardiac issues, her reluctance was not unexplained and is not a clear rationale for discounting Plaintiff's alleged symptoms.

In sum, the ALJ failed to provide clear and convincing reasons for discounting Plaintiff's subjective symptoms.  This error was not harmless as it impacted the ALJ's RFC determination.

**E.    Remaining Arguments**

Plaintiff raises five additional arguments: her second argument, that the ALJ's step two findings of non-severity as to her vision loss, right hand tightness, and left knee pain are factually and legally untenable, *id.* at 16–17; her third argument, that the ALJ failed at step two to even mention several of Plaintiff's medical conditions, such as depressive disorder and her musculoskeletal issues, and failed to make findings as to whether they were severe or non-severe, *id.* at 17; her fourth argument, that the ALJ's step three finding was "entirely defective on its face," *id.* at 17–18; her seventh argument, that the ALJ erred in evaluating Plaintiff's RFC, *id.* at 26; and her eighth argument, that the ALJ's step four analysis was based on the wrong RFC, *id.* at 27.  Plaintiff's arguments on these points, however, rely heavily on her argument that the ALJ erred in assessing the medical opinions in this case.  Because the Court agrees that the ALJ erred in assessing the medical opinions, and because the ALJ's listings and RFC determinations were necessarily predicated on assessment of the medical opinions, the Court remands on these issues as well.  On remand, the ALJ must analyze whether Plaintiff meets a listing and evaluate her RFC based on assessment of the medical opinions.

**F.    Remedy**

The remaining question is whether to remand for further administrative proceedings or for the immediate payment of benefits.  The Social Security Act permits courts to affirm, modify, or reverse the Commissioner's decision "with or without remanding the case for a rehearing."  42 U.S.C. § 405(g); *see also Garrison*, 759 F.3d at 1019.  "[W]here the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court

33

1    should remand for an immediate award of benefits."  *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th

2    Cir. 2004).  However, "[r]emand for further proceedings is appropriate where there are

3    outstanding issues that must be resolved before a disability determination can be made, and it is

4    not clear from the record that the ALJ would be required to find the claimant disabled if all the

5    evidence were properly evaluated."  *Luther v. Berryhill*, 891 F.3d 872, 877–78 (9th Cir. 2018)

6    (citations omitted).  It is only "rare circumstances that result in a direct award of benefits" and

7    "only when the record clearly contradicted an ALJ's conclusory findings and no substantial

8    evidence within the record supported the reasons provided by the ALJ for denial of benefits."

9    *Leon v. Berryhill*, 880 F.3d 1041, 1047 (9th Cir. 2017).

10          Here, the ALJ failed to fully and fairly develop the record when evaluating Plaintiff's

11   disability claim.  Plaintiff's third argument (concerning the ALJ's failure to mention several of her

12   medical conditions in the step two analysis) is an error of omission.  Her fourth argument (that the

13   ALJ's step three finding is defective on its face) is based on the ALJ's failure to identify what

14   listings he considered and his failure to assess the combined impact of Plaintiff's impairments.

15   These are also errors of omission.  Plaintiff's sixth argument, regarding the ALJ's disregard of her

16   own medical testimony, is compounded by the ALJ's failure to ask any questions at the hearing

17   concerning Plaintiff's symptoms during the relevant period at issue in this case.  Plaintiff's third

18   and fourth arguments feed into her seventh argument (regarding the ALJ's assessment of

19   Plaintiff's RFC) because the ALJ's assessment of Plaintiff's RFC likewise gave no consideration

20   to the medical conditions he did not consider or to the combined impact of her impairments, which

21   he did not consider.  And, of course, her eighth argument (that the ALJ's step four finding was

22   based on an erroneous RFC determination) follows from the seventh.  The net effect is that these

23   errors of omission pervade the ALJ's analysis.

24          Plaintiff requests that the Court remand for further proceedings because her Title XVI

25   claim has not been decided.  Pl.'s Mot. at 27.  Because the Court finds Plaintiff has waived her

26   outstanding claims for Title XVI benefits, the Court does not remand for the purpose of

27   determining Plaintiff's eligibility for benefits after her date last insured of December 31, 2012.

28          However, even though this case has already been remanded twice, it is not clear that the

United States District Court
Northern District of California

ALJ would be required to find Plaintiff disabled for the period from December 23, 2011 to December 31, 2012.  Accordingly, remand for further proceedings is appropriate.

## VI.    CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiff's motion, **DENIES** Defendant's cross-motion, and **REVERSES** the ALJ's decision.  This matter is **REMANDED** for further administrative proceedings consistent with this order.  The Court shall enter a separate judgment, after which the Clerk of Court shall terminate the case.

**IT IS SO ORDERED.**

Dated: March 21, 2024

THOMAS S. HIXSON
United States Magistrate Judge

United States District Court
Northern District of California

35